FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FT. WORTH DIVISION

2009 JUL 17 PM 1: 56

CLERK OF COURT

A
ORIGINAL

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF TEXAS
### Ft. Worth Division

| | | |
|---|---|---|
| Siyuan LIU, | * | |
|     Plaintiff | * | Civil Action |
| v. | * | |
| | * | No. 4-09CV-415-A |
| Lee F. JACKSON, | * | |
|     as Chancellor of the | * | |
|     University of North Texas System; | * | Judge McBryde |
| | | |
| Dr. Scott RANSOM | * | |
|     as President of the | * | |
|     University of North Texas | * | |
|     Health Science Center; | * | |
| Dr. Thomas MOORMAN, a natural person; | * | |
| Dr. Roberto CARDARELLI, a natural person, | * | |
|     Defendants | * | |

# Plaintiff's First Amended Complaint

## Subject Matter Jurisdiction:

Plaintiff asserts multiple causes of action under 42 U.S.C. §1983. This Court therefore has jurisdiction under 28 U.S.C. §1343 and §1331.

The Eleventh Amendment does not bar this proceeding, since only injunctive relief is sought against Chancellor Jackson and President Ransom in their official capacities.

Plaintiff also asserts state law claims arising out of the same facts. These are properly within this Court's supplemental jurisdiction (28 U.S.C. §1367).

## Parties

**Plaintiff:** Siyuan Liu is a citizen of China, now residing at apt. 510, 7501 Secretariat Ct., Fort Worth TX 76112. He is a graduate of Simon Fraser University in Canada, and has been a graduate student in the UNT System since August of 2008. He is not fully fluent in English.

**Defendant 1:** Chancellor Jackson is head of the University of North Texas ("UNT") System, of which the Health Sciences Center in Fort Worth is just one component. (See the UNT System organization chart, attached as **Appendix A**.) He is being named in his official capacity only, and no individual liability is asserted against Chancellor Jackson. According to the website at http://untsystem.unt.edu/, Chancellor Jackson's mailing address is 1155 Union Circle #311220, Denton TX 76203-5017. All Defendents are being represented by the Office of the Attorney General of Texas, and specifically by Bill Deane bill.deane@oag.state.tx.us, 512-936-1534.

**Defendant 2:** Dr. Ransom is President of the University of North Texas Health Science Center ("UNT-HSC"), at 3500 Camp Bowie Blvd., Fort Worth TX 76107. He is being named in his official capacity only, and no individual liability is asserted against him.

**Defendant 3:** Thomas Moorman is an employee of the UNT System, and the Vice President for Student Affairs at UNT-HSC. He can be reached through the UNT-HSC switchboard, at 817-735-2000. UNT Counsel are able to communicate notice to him, and the undersigned attorney is sending a copy of this filing to the Attorney General of Texas.

**Defendant 4:** Dr. Roberto Cardarelli is an employee of the UNT System, and a tenured Professor at UNT-HSC. He can be reached through the UNT-HSC switchboard, at 817-735-2000. UNT Counsel are able to communicate notice to

him, and the undersigned attorney is sending a copy of this filing to the Attorney General of Texas.

Plaintiff contends that no immunity applies to the individual actions of Thomas Moorman and Dr. Roberto Cardarelli, since they were undertaken with gross disregard for the UNT System's own stated policies.

## **Venue and Personal Jurisdiction**

Many of the events in question occurred on the campus of the University of North Texas Health Sciences Center, which lies within the Fort Worth Division of the Northern District of Texas. Plaintiff also resides within this District and Division. The home office of the UNT System is located in Denton Texas, which is within the Eastern District of Texas; but it appears that venue in Fort Worth, rather than Sherman, would best serve the convenience of the defending parties, and expedite rapid resolution of preliminary matters.

## **Fact Summary:**

1. Plaintiff Siyuan Liu is a citizen of China, who attended college in Canada. He was highly recommended by his professors there, and admitted to the master's program in biostatistics at the University of North Texas campus in Fort Worth.

2. Mr. Liu came to Texas in August of 2008, to enroll at UNT-HSC. During his first year of studies he received excellent grades, was the top-ranked student in his department, and was invited to apply for the doctoral program.

3. In May of 2009 Mr. Liu paid the University for a required "practical experience" course credit, in which he worked (unpaid) in a University facility (the "PCRI"), under the direction of Prof. Kim Fulda. The PCRI had specifically asked for Mr. Liu, because of Mr. Liu's certified expertise in statistics. Dr. Robert Cardarelli is the head of PCRI.

Page 3

4. During his work at PCRI, Mr. Liu had to use a shared computer. (Anyone in the school can log on to this computer, and medical students often do so in passing.)

5. For Mr. Liu's research work he needed access to some large uncopyrighted government-published databases which were not available on that computer, namely "NHANES" and "BRFSS". As resourceful graduate students commonly do, he solved the problem: on May 18 he installed a legitimate download management software he was familiar with, namely Thunder. Unknown to Mr. Liu, this solution itself would cause problems.

6. "Thunder" is the flagship program of Thunder Corporation, which is partly owned by Google. Thunder is widely used for file management software by Chinese-speaking computer users, and comes pre-installed on the majority of new computers sold in China. It is also routinely used by Chinese college students in China, Canada, and the United States.

7. Mr. Liu did not conceal his use of Thunder, and had no reason to believe that he was violating any University policy whatever. No University communication had ever suggested that Thunder was prohibited, nor that Thunder might be P2P or file-sharing software.

8. Thunder is a program which starts automatically whenever the computer is started up, and works automatically without any user initiation. Apparently some users began using Thunder for downloads of other material, and this caused an increase in traffic on the UNT-HSC internet connection.

9. On June 9 Patrick Vert from the IT department came to the lab where Mr. Liu was working, and said file-sharing software was running on the computer

which Mr. Liu was then using. Mr. Liu guessed that the bad software might be Thunder, and immediately started to uninstall it. However, Mr. Vert said that IT would take care of it.

10. On or about June 10, Dr. Roberto Cardarelli announced that he wanted Mr. Liu gone. On the basis of that demand, Dr. Coggin removed Mr. Liu from PCRI, and the UNT-HSC began building a case to expel Mr. Liu. Steps taken, in secrecy from Mr. Liu, included the following:

a. On June 11 Patrick Vert sent a requested email to Thomas Moorman. This email is obviously a sequel to some other email which has not been disclosed.

b. On the same day, Lee Ann Cunningham prepared another requested email. Ms. Cunningham is responsible for computer operations on the whole PCRI floor (dozens of computers, many nurses, doctors, and passing medical students). This email reveals that Ms. Cunningham had to ask Patrick Vert "what file sharing was." It also reveals that she was asked by Dr. Cardarelli to verify "that" (not "whether") Plaintiff had performed an unaccepted and potentially illegal practice.

c. Early on June 12 Dr. Moorman wrote to Dr. Kurz, the Dean of the School of Public Health, to announce that the shared computer taken by Mr. Vert contained "illegal" software and illegally downloaded movies and concerts. This letter alleged that Plaintiff had infringed Federal copyright and used a file sharing program "illegally," but these allegations were carefully concealed from him.

d. Summaries of alleged witness statements from Dr. Coggin and Susan Harlin were also placed in Mr. Liu's file. The file does not show when or by whom these statements were taken, but they purport to describe events on the morning of June 12. These statements show that Mr. Liu was bewildered about the unexplained action against him, and begging for some explanation. They also

show that Dr. Coggin "denied any knowledge of the specific events," but simply stated that Dr. Cardarelli wanted him gone.

e. Faculty were instructed to forward any email communications from Mr. Liu to Dr. Moorman, and may have been instructed not to communicate with Mr. Liu at all.  For example, on Monday June 15 Mr. Liu wrote to Dr. Fulda, his boss at PCRI, still desperately asking (again) what the problem was.  She did not answer, but merely forwarded his email to Dr. Moorman.

11. On June 15, Dr. Trisha van Duser summoned Mr. Liu to a hearing.

a. He replied immediately by email, begging for some explanation of why actions were being taken against him.  Dr. van Duser did not answer, but Dr. Moorman then telephoned Mr. Liu.

b. Dr. Moorman asked Mr. Liu whether he knew what violation he was accused of.   Mr. Liu replied that he had no idea, since nobody would tell him.

c. Dr. Moorman then said that Mr. Liu had been using illegal software, and Mr. Liu immediately asked what was illegal software.  Moorman replied that file sharing software was not allowed by school policy, and suggested to Mr. Liu that he should just come to the meeting and tell the people there what happened.

d. Mr. Liu specifically asked whether technical experts would be present at this hearing, and Dr. Moorman assured him that they would be.

e. Mr. Liu also specifically asked what the hearing was for, and what he should do to prepare for it; and Dr. Moorman told Mr. Liu, again, that he should just come to the meeting and tell the people there what happened.

12. Mr. Liu was thus kept in the dark until the purported hearing on Thursday June 18.  At that hearing no computer professionals were present (as had been promised), only Dr. Van Duser and a student.  The prosecution case was presented by Dr. Van Duser.  No evidence was presented to show that anything

Mr. Liu had done violated any school rule or policy. There is no verbatim record of this purported hearing, but it appears that Dr. Van Duser (as prosecutor) presented her own testimony (as witness to anonymous hearsay) to herself (as adjudicator) in the following manner.

a. First, she invited Mr. Liu to testify, before he had even heard the charges against him.

b. She then stated that Mr. Liu had violated school policy.

c. He asked her what policy he could possibly have violated, and she then pointed to sections V.A.7 and V.B.10 of the Student Code. This was the first that anyone had suggested to Mr. Liu that he might have violated either of those sections.

d. Mr. Liu pointed out that he is not a computer professional, has never intended to commit any "abuse" of computing resources, and did not believe that he had. He again requested a detailed explanation of how he could have violated this rule, but Dr. Van Duser didn't respond.

e. Instead, Dr. Van Duser then asserted that Mr. Liu's activities had taken up most of the bandwidth of the school and put their computer in risk of exposing personal information to potential hackers. Plaintiff does not know what Dr. Van Duser's basis for these assertions was. Plaintiff is not aware that Dr. Van Duser has any special expertise on computer software and networking.

f. Dr. Van Duser then mentioned that the IT dept had sent a broadcast email in October 2008 about file sharing software. A copy of this email was inserted into the school's file against Mr. Liu at some point AFTER the June 18 hearing. Plaintiff does not know how else the file may have been altered after the June 18 hearing. Note that this email also admits that file sharing software is "a legal technology with legal uses."

g. Dr. Van Duser asked Mr. Liu what he had downloaded, and Mr. Liu freely admitted that he had downloaded the public databases mentioned above, as well as Korean TV shows which do not violate U.S. copyright law.

h. Mr. Liu also tried to assure her that he understood that U.S. laws and customs were different, and that he was trying very hard to follow U.S. practices. Unfortunately this led to an acrimonious debate on Chinese culture, which apparently Dr. Van Duser disapproves of.

i. Dr. Van Duser then asserted that copyrighted music and video files were found on the same shared computer. Mr. Liu denied any knowledge of such files, and asked what they were. Plaintiff has been told that a download of a movie called "Hotel for Dogs" was present, but Plaintiff owns a legal copy of that movie on DVD. To this day Plaintiff does not have any clue as to what music files might have been present on that computer.

j. No consideration was given to the question of WHO might have improperly downloaded copyrighted material. Since more than 1000+ people could log into this computer, and since dozens of people do log in on this and neighboring computers, this is an important question.

k. No consideration was given to "fair use" of copyrighted material.

l. No consideration was given to WHEN the copyrighted material might have been downloaded. Mr. Liu had accessed this computer only during a few weeks of its life.

m. The only documents shown at the hearing were the Student Code of Conduct, and the broadcast email of October 2008. Both of these are general provisions, and not any evidence of what Mr. Liu did or didn't do.

n. Nobody present, including Mr. Liu, was competent to discuss issues of firewall technology, which is important in view of the wild rumors which apparently had circulated. (Technical issues are described below.)

o. Mr. Liu was unable to understand much of the discussion, including almost everything said by the Indian student present (who also had a thick accent, but a different one than Mr. Liu). However, no translator was offered.

13. Mr. Liu was then kept in suspense again, until he was summoned to Dr. Moorman's office. At this meeting, on <u>Monday June 22</u>, the following occurred:

a. Dr. Moorman smiled, shook Mr. Liu's hand, welcomed him, and invited him to come in and sit down.

b. He then asked Mr. Liu to recount for him, one more time, just what had happened.

c. He then handed Mr. Liu a sealed envelope with a pre-prepared letter. As Mr. Liu opened the envelope, he asked Dr. Moorman what the decision was. Dr. Moorman smiled broadly, and said "Academic withdrawal."

d. Dr. Moorman then left briefly, to bring in a waiting campus policeman from just outside the office. The policeman was in uniform, with a badge, a pistol, handcuffs, and a Taser. With the policeman standing next to the seated Mr. Liu. Dr. Moorman declared that Mr. Liu had violated Federal law. The policeman remained in the office during the entire ensuing conversation.

e. Mr. Liu asked whether Dr. Moorman had consulted his Department chair (Dr. Singh), and Dr. Moorman admitted that he had not.

f. Mr. Liu pointed out that the pre-prepared letter claimed that he had made admissions which he had consistently and emphatically denied.

g. Mr. Liu also pointed out that the penalty against him was wildly disproportionate to the alleged offenses, and Dr. Moorman responded that the University could take whatever action it thought appropriate.

h. Plaintiff pointed out that he was in this country on a student visa, and needed to keep his student status. Dr. Moorman replied that Mr. Liu could transfer

to another school or leave this country in two weeks. Mr. Liu asked then whether there would be something shown on my transcript, and Dr. Moorman said that "academic withdrawal" would be stated at the end of my transcript.

    i. Dr. Moorman also added that he was expelling Mr. Liu because he was "very likely to violate the federal law again." Plaintiff does not know what this defamatory assertion is based on, other than his Chinese nationality.

    i. Moorman also stated that Plaintiff was not allowed to come onto campus, from that day on, without Moorman's permission. Moorman told Liu that he would have to make an appointment with Moorman before doing so, so that Moorman could notify the police department. Moorman also said that, if Liu wanted to meet with anyone on campus, it could only be in Moorman's office with Moorman present.

    14. Mr. Liu immediately filed a Notice of Appeal (on <u>Monday June 22</u>), but the University did not schedule any Appeal hearing in the ensuing two weeks. However, the University's own Code states that: "the committee's meeting for review of the disciplinary action *[should]* be arranged normally within ten (10) working days of the Chief Student Affairs Officer's decision, or as soon as practicable." That would imply that the committee meeting should have been held by July 7, and that Mr. Liu should have received notice of such meeting by July 1. Plaintiff does not know of any reason that such a schedule would not have been practicable. Plaintiff has not been asked for, nor has Plaintiff agreed to, any extension of this schedule.

    <u>15. On Tuesday June 23</u> Mr. Liu called Dr. Moorman. In this conversation:

a. Mr. Liu told Dr. Moorman again that he had not downloaded movies nor concerts, and was surprised by that allegation.  Mr. Liu requested the Dr. Moorman at least issue a new expulsion letter without those allegations.

b. Dr. Moorman rejected this request, and said Mr. Liu was expelled not for that reason, but using file sharing software.

c. Mr. Liu then asked that the letter be corrected in that respect at least, and Dr. Moorman refused again.

16. On July 14 Dr. Moorman sent a letter to Mr. Liu (in care of the undersigned attorney), responding to Mr. Liu's Notice of Appeal with new charges, new evidence, new witnesses, and a suggestion that still other unnamed witnesses might introduced.  An edited version of Mr. Liu's file was attached, including (as Dr. Moorman admitted) evidence which had not been considered at the purported hearing on June 18.  More surprisingly, the file had been stringently purged of anything which might be exculpatory.

17. Expulsion from graduate school is a death knell for any professional career.  Mr. Liu would have great difficulty in transferring to any other graduate program with such a stigma branded on him.  Mr. Liu would also have great difficulty in finding any professional employment, ever.

18. Mr. Liu has never intentionally violated any rule, but has repeatedly offered to apologize for any inadvertent violations.  Mr. Liu is very aware of being a stranger in a strange land, and has made great efforts to follow the rules and customs of the country where he is a guest.

19. "Peer-to-peer" architecture is a basic concept in networking, used to refer to systems which do not have a central point of control.

a. Such architectures are used for data storage, sensor networks, and many other purposes, including (most relevant to this case) data communications.

b. Peer-to-peer software is often used for data communications, because it is highly scalable (unlike a client-server architecture), and not susceptible to failure or congestion at a single point.

c. The particular kind of peer-to-peer software which permits users to find files on other computers is referred to as "file-sharing" software. For example, a reader who wants to get a legal copy of a public-domain book from Project Gutenberg can probably find it much faster with file-sharing software than by downloading it directly from the overcrowded Project Gutenberg site.

d. Unfortunately, these technological advantages have also made it easy for users around the globe to get access to copyrighted material.

e. Download management software has been popular for decades, and continues to be commonly used for users to manage downloads. For example, when a user buys a music album from Amazon.com, the Amazon site will send the user a download management application which manages the download of the actual media files purchased.

e. Thunder is a download management program with some characteristics of a file-sharing program, but there seems to be some argument about whether it really is properly described as "peer-to-peer." As shown by http://en.wikipedia.org/wiki/Xunlei (reprinted as **Appendix F**), this seems to be a topic of active disagreement. It is difficult for non-experts to understand this debate.

20. Many very common programs, such as MSN Instant Messenger or AIM, routinely bypass the Network Address Translation operation of firewalls. This operation is also common in software components which improve security by

using a secure shell protocol ("ssh").  It is false and misleading to suggest that this common operation "breaks" a firewall, since the firewall remains fully functional during and after such a bypass.  It is even more misleading to suggest that this common operation exposes all data inside the firewall to outside access.

## First Cause of Action: Violation of Due Process Rights

21. The statements of fact in paragraphs 1-20 are hereby incorporated by reference as if repeated here in their entirety.

22. The UNT System's own Policy Manual, at Section 18_5_5 (attached as **Appendix B**) states that "each institution shall adopt policies or review existing policies to insure that the following elements of due process are substantially complied with."   The System Policy Manual then lists 13 specific requirements, every single one of which was violated by the summary action against Mr. Liu, and then also states that "The above constitute the minimum constitutionally mandated due process."   These requirements of the UNT system policy manual 1) apply directly, 2) define the context for interpreting UNT-HSC procedures, 3) define a standard for validity of the UNT-HSC procedures, and/or 4) are relevant as an admission against interest.   Plaintiff would agree that these 13 enumerated requirements set no more than a minimum standard for due process in the context of University student discipline.

23. The facts recounted above appear to show that various defendants systematically prepared a case against Mr. Liu in secret, despite the University's requirements for disclosure of charges and evidence.   A trap was carefully constructed in the dark, and then suddenly sprung on Mr. Liu on June 22.

24. Mr. Liu has been perfectly candid about actions which he had no reason to believe were forbidden. However, the University's tactics against him have relied very heavily on attempts to trap Mr. Liu into admissions, even to the point of alleging unrecorded admissions which Mr. Liu emphatically denies. Such entrapment is particularly unfair against a victim who is not fully fluent in English.

25. Another very surprising point is that Dr. Moorman actively interfered with Mr. Liu's communications with friendly potential witnesses. It is hard to imagine any legitimate reason for this. The July 14 letter shows that University officials have continued to try to build a case against Mr. Liu, but this is highly improper: if Defendants now recognize some of their errors, the proper course would be to cease their malicious attack. The attempts to coordinate witnesses, and to limit Plaintiff's access to helpful witnesses, strongly suggest that the University's eagerness to spread the worst allegations, and to continue reinforcing its weak case, have strong potential to color or corrupt the testimony of witnesses.

26. Note also that Mr. Liu's file has been manipulated. As the University's own file shows, material which did not exist on June 18 was added to the file on June 19. (Notice the printout date on the purported copy of the October 2008 email.)

27. Defendants have still not shown any interest in considering exculpatory evidence; since nearly all such evidence is under Defendants' control, the suppression of such evidence works grave harm to Plaintiff's ability to defend himself. The unaltered version of the University's file suggests that Mr. Liu's fate was sealed on June 10, when Dr. Cardarelli announced that Mr. Liu should be gotten rid of. In hearing of June 18, no technically competent people were present (despite promises), and no evidence was presented. A more recent instance of this

is shown in the July 14 communication, which shows that University officials have continued to try to find ways to bolster their case against Mr. Liu. Note that University officials have now made a new charge against Mr. Liu which was never raised before, namely dishonesty under V.A.9. University officials have now provided a new piece of alleged evidence, namely screenshots of a computer with no particular connection to Mr. Liu. These last-minute additions to the case against Mr. Liu do not allow the University officials time for any careful consideration of relevance or accuracy of the material so submitted. They also do not allow Mr. Liu to defend himself against this never-ending stream of accusations and purported evidence. The continued intensive work by high University officials to bolster the case against Mr. Liu also reveals a climate that will make it very difficult for any University witness to testify in favor of Mr. Liu.

28. Thus Mr. Liu requests relief under 24 U.S.C. §1983 for the violation of his 5th and 14th Amendment rights to due process of law.

## Second Cause of Action: Equal Protection

29. The statements of fact in paragraphs 1-20 are hereby incorporated by reference as if repeated here in their entirety.

30. It is common knowledge that P2P software is used by many students and faculty on every college campus, and the IT department letter of June 18 shows that this is still an ongoing problem. Thus it is puzzling that Mr. Liu alone should be singled out for the most extreme punishment possible, when the IT department could easily identify many persons on campus who have used and are still using

file-sharing software.   The IT department could easily search other university computers for audio and video files if it wished, and would undoubtedly find many.

31. The allegations in paragraphs 23-27 above are hereby incorporated too. These violations of due process, and especially the systematic orchestration of these violations, suggest that some ulterior motive must have been present.   The history of this case, as detailed above, suggests that attitudes about persons of Chinese nationality or ethnicity may have been the unseen hand.   This case does not concern the billion persons in China: it concerns one person, Siyuan Liu, an student whose professional career is being ruined.   If it is a crime to be Chinese, then Mr. Liu is guilty; but if it is not, he is not.

32. The outburst by Dr. Van Duser against Chinese, in the hearing of June 18, shows the grossest possible kind of prejudice.   Without this prejudice, it is hard to understand why the University would so mistreat any one student; but if we acknowledge the prejudice, the story makes sense.

32. Thus Mr. Liu requests relief under 24 U.S.C. §1983 for the violation of his 5th and 14th Amendment rights to equal protection under the law.


## Third Cause of Action: Substantive Due Process

33. The statements of fact in paragraphs 1-20 are hereby incorporated by reference as if repeated here in their entirety.

34. If the University's interpretation of its own regulations are correct, then these regulations constitute an extreme violation of students' due process rights, to

the point where they would constitute a substantive violation of all students' due process rights.

35. The undersigned attorney acknowledges that this cause of action is rarely appropriate, but the University's regulations, as interpreted by the University officials, are egregiously contrary to the Constitutional rights of all students, and should therefore be invalidated and enjoined. These regulations, so interpreted, are respectfully submitted to meet the test of County of Sacramento v. Lewis, 523 U.S. 833 (1998), *i.e.* they "shock the conscience" and "violate the decencies of civilized conduct." These regulations would not be a substantive due process violation in boot camp or reform school, but in a peaceful and scholarly university environment this is a stunning attack on individual rights.

36. Specifically, the University has asserted that they have the right to impose any penalty they wish, no matter how trivial the offense, regardless of harm caused by the offense, and regardless of the presence or absence of malicious intent.

37. The University has also asserted that all students, even the large majority who are not competent in the technology of network security, are chargeable with a degree of knowledge which even the University's IT staff do not all possess.

38. The University has also asserted that conduct which is not clearly prohibited by its Student Code, nor by the IT department policies, is somehow worthy of the most extreme punishment.

39. Thus Plaintiff requests injunctive relief under 42 U.S.C. §1983, to invalidate and enjoin the University regulations so applied, as inconsistent with the 5th and 14th Amendments. This injunctive relief is necessary not only to protect Mr.

Liu, should he resume his relationship with the University, but also to protect other persons similarly situated.

## **Fourth Cause of Action: State Law Claims for Defamation**

40. The statements of fact in paragraphs 1-20 are hereby incorporated by reference as if repeated here in their entirety.

41. Thomas Moorman claimed, in writing, that Siyuan Liu had committed crimes and acts of dishonesty. As the recited facts show, he made these statements not only without reasonable investigation, but also with purposeful disregard for any sources of evidence which might have been available in Mr. Liu's favor. He also published these allegations widely, within the University at least — far more so than was required for any arguably legitimate application of university discipline.

42. All the elements of this Texas cause of action appear to be present: are therefore met: false assertions of fact regarding a private matter, and referring to Plaintiff variously by name and by identifiable references, were published by one or more Defendants, to Plaintiff's great detriment. These allegations included (by reference to the "Student Code of Conduct") allegations that Plaintiff was dishonest, and that Plaintiff violated the laws of the United States.

43. Plaintiff therefore claims all remedies for this intentional tort which are available under Texas law.

44. Plaintiff specifically claims exemplary damages, because it appears that these false statements were made with actual malice.

45. This Cause of Action, with other state law claims based on the facts above, is properly within the supplemental jurisdiction of this court.

## **Fifth Cause of Action: State Law Claims for False Arrest**

46. The statements of fact in paragraphs 1-20 are hereby incorporated by reference as if repeated here in their entirety.

47. On June 22, 2009, Thomas Moorman ordered a uniformed and armed police officer to immediately take Siyuan Liu in charge and escort him off campus. Plaintiff contends that this detainment was an arrest. (Mr. Liu was immediately constrained in his movements, was required to follow the policeman's orders, and was reasonably in fear that he might be tased or thrown into prison.)

48. Mr. Liu had not committed any violent, dangerous, disruptive or terroristic action which would even arguably justify such an action. This precipitous action was taken at a meeting where Mr. Liu had innocently come to hear the promised answers to his questions (which he did not receive). Thus, this action appears to be part of the systematic campaign which had been aimed at getting Mr. Liu off campus.

49. As shown by the recited facts, all elements of this tort are present: Defendants' willfully detained Plaintiff; Plaintiff did not consent to the detention; Defendants had no legal authority nor justification to detail Plaintiff; and Defendants' wrongful acts caused harm to Plaintiff, including without limitation infliction of an emotional state of terror, inability to communicate with persons at the University who are able to be helpful or friendly to Plaintiff's case, inability to legally argue to preserve his rights, and constraint of Plaintiff's movements.

50. Plaintiff therefore claims all remedies available under Texas law, each against all Defendants against whom such remedy is available, including actual damages, exemplary damages, and preliminary and permanent injunction.

51. This Cause of Action, with other state law claims based on the facts above, is properly within the supplemental jurisdiction of this court.

## Exhaustion and Ripeness

52. Exhaustion of state administrative remedies is not required in section 1983 actions, see Patsy v. Board of Regents, 457 U.S. 496 (1982). In this case particularly, the state administrative process has already been tampered with to the point where it has exhibited fundamental injustice to Plaintiff, and is operating merely as a vehicle for further attack.

53. This case is ripe for judicial view at this point, since Defendants already have taken definitive action against Plaintiff.   As the evidence shows, the University secretly decided on its position adverse to Plaintiff as early as June 10 or 11, and IMMEDIATELY ejected Plaintiff from his coursework.   University officials thereafter rushed and short circuited its own processes for the purpose of getting Plaintiff off campus as soon as possible.

54. If the University chooses to stop its improper actions against Plaintiff (as it should), that still should not cut off judicial review: see Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc., 528 U.S. 167 (2000).

55. The University has now sought to open a purported Appeal process (after its own due date for such action), but in view of the procedural taint on this case such a process provides Plaintiff with no meaningful review.

a. The University's purported Appeal process cannot redress the damages already suffered by Plaintiff. The University has taken the position that Plaintiff must suffer the loss of all his working time since May 12, and no remedy for this loss, and related harm, is available through the University's procedures.

b. The University's own appeal process is ill suited to address the unjust racially-based attacks against Plaintiff, especially since such attacks were made by the very persons who have managed the University's process all along.

c. In view of the political manipulation which has already occurred within the University's procedures, it would now be very difficult for any member of an appeal committee to withstand the pressure which has been applied to expel Mr. Liu.

## Remedies Sought

56. Plaintiff requests actual damages in excess of $75,000, or as shown by the evidence, against named individual Defendants 3 and 4, and against any other Defendants where such relief is available. Components of damages would include: Loss of the money Mr. Liu paid for tuition; the value of his services as a certified expert in SAS; loss of his damage to his reputation; damage to his lifetime career earnings prospects; damage to his ability to obtain part-time employment; and other damages as the evidence may show.

57. Plaintiff seeks Preliminary and Permanent Injunctions to enjoin further violations of his rights, and to force all Defendants to undo, to the extent possible,

the enormous damage they have already done to him. Plaintiff also seeks Emergency Relief, as detailed below.

58. Under 42 U.S.C. §1985 Plaintiff also requests attorney and expert fees if any, as well as the fair value of Robert Groover's *pro bono* services in attempting to negotiate a settlement, and in preparing, filing, and arguing this case.

59. Plaintiff therefore prays for relief as above.  Respectfully submitted,

Robert Groover
Texas bar card 08529200
Email: groover@technopatents.com
972-980-5838, fax 972-980-5841
2445 Midway Road #100
Carrollton TX 75006

OF COUNSEL

Groover & Associates

ATTORNEY IN CHARGE FOR

Plaintiff, Siyuan Liu

STATE OF TEXAS                    §
TARRANT COUNTY                   §

## <u>VERIFICATION</u>

Before me, the undersigned notary, on this day personally appeared Siyuan Liu, the affiant, a person whose identity is known to me. After I administered an oath to affiant, affiant testified:

"My name is Siyuan Liu. I have read the foregoing Complaint. The facts stated in Paragraphs 1-18 are within my personal knowledge and are true and correct. Other facts stated are correct to the best of my knowledge and belief."

_____
Siyuan Liu

SWORN TO and SUBSCRIBED before me by Siyuan Liu on July 16th, 2009.

BAHARAK SOTOUDEH
Notary Public in and for

the State of Texas



BAHARAK SOTOUDEH
Notary Public State of Texas
Commission Expires
MARCH 18, 2013

## **Certification**

I, Robert Groover, hereby certify to the court that a complete copy of this amended Verified Complaint has been sent by email to Bill Deane at the email address given above.  I discussed this filing with Mr. Deane on July 14, and again today.

_____

Robert Groover